IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FELICIA TAPPAN, | ) |
| | ) No. 15 C 02496 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Magistrate Judge Susan E. Cox |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of the U.S. Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Plaintiff Felicia Tappan ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her Social Security disability benefits under Title II of the Social Security Act ("SSA") and Supplemental Income under Title XVI of the SSA. The Court grants Plaintiff's motion for summary judgment [16] and denies the Commissioner's motion for summary judgment [23].[1] This case is remanded for further proceedings consistent with this opinion.

## STATEMENT

### I. Procedural History

Plaintiff originally filed her application for Social Security disability benefits and Supplemental Income benefits on April 26, 2012, alleging she had been disabled since April 1, 2012. (R. at 129). Plaintiff's application for benefits was initially denied on July 26, 2012, and a subsequent reconsideration was denied on December 6, 2012. (R. at 129). On January 16, 2013,

---

[1] The Court construes Plaintiff's Memorandum in Support of Remand as a Motion for Summary Judgment. The Court also notes that, in the future, the Commissioner should respond to Plaintiff's motion rather than filing a cross-motion for summary judgment.

plaintiff filed a written request for a hearing before the Administrative Law Judge ("ALJ"). (R. at 144). Plaintiff appeared and testified in Chicago, Illinois, before the ALJ on November 1, 2013. (R. at 28). On November 29, 2013, the ALJ issued a written decision denying Plaintiff's application. (R. at 6-17). The Appeals Council denied review on January 22, 2015, thereby rendering the ALJ's decision as final for the agency. (R. at 1-5).

## II. Medical History

Plaintiff's medical record demonstrates a lengthy history of neck and back problems. On August 16, 2010, Plaintiff received a referral for surgery from her primary care physician, Dr. Andi Arnautovic, to repair a large central disc protrusion at C4-5. (R. at 437). In early November 2010, Plaintiff underwent surgery at Mount Sinai Hospital to repair the central disc protrusion at C4-5. (R. at 448). In a post-surgery status update on January 21, 2011, Dr. Alan Hecht, of Mt. Sinai Medical Center, stated that there was a stable alignment of the spine and the disc spaces were intact; although there was a "slight prominence prevertebral space." (R. at 429).

On August 9, 2011, Plaintiff visited Dr. Arnautovic for back pain. (R. at 327). She complained that the pain had been ongoing for over a year, and the pain occurred intermittently. (R. at 334). She identified the pain as a 4/10 and her symptoms would become aggravated when bending. *Id.* The use of nonsteroidal anti-inflammatory drugs provided significant relief for the pain. *Id.* She returned to Dr. Arnautovic on February 24, 2012, due to numbness in her fingers, and reported that the pain had increased to an 8/10. (R. at 343, 345).

On June 8, 2012, Plaintiff visited a neurologist, Dr. Michael Strurgill. In the four months leading up to her appointment with Dr. Sturgill, Plaintiff experienced falls, neck pain, hand clumsiness, legs giving out, difficulty walking up and down stairs, and tingling. (R. at 424). Plaintiff was diagnosed by Dr. Sturgill with recurrent myelopathy and referred for flexion-

extension x-rays and an MRI of the cervical spine. (R. at 425). On June 20, 2012, Plaintiff's x-ray results showed status post anterior fusion C4-C5, considerable limitation of flexion, and degenerative changes in C5-C6. (R. at 355). Additional x-rays showed mild levocurvature in the lower thoracic spine. (R. at 356). Finally, an MRI of her cervical spine showed a moderate degree of central bilateral foramina narrowing at C3-C4 and significant narrowing of the left neural foramen and C4-C5. (R. at 358).

On July 13, 2012, prior to her second surgery, Plaintiff participated in a consultative exam performed by Dr. Dante Pimentel. Dr. Pimentel spent approximately 30 minutes obtaining Plaintiff's medical history and performing his examination. (R. at 366). Plaintiff informed Dr. Pimentel of a motor accident that occurred in 2002, and that she was informed in 2010 by doctors at Mount Sinai Hospital that the accident was the cause of her injury. *Id*. Plaintiff claimed to have decreased use of her right hand, and complained of pain in her shoulder, back, and left leg during that period. *Id*. Plaintiff's motor strength was a 5/5 and sensation was intact in all extremities. (R. at 367). Dr. Pimentel had access to all results from Plaintiff's June tests. (R. at 368). Dr. Pimentel found that Plaintiff could: (1) sit, stand, and walk greater than fifty feet unassisted, (2) carry out work-related activities, and (3) had the ability to lift, carry, and handle objects in a mildly limited way. *Id*. Dr. Pimentel opined that Plaintiff would be able to lift and carry twenty pounds occasionally and ten pounds frequently. Plaintiff would also be able to stand and walk with normal breaks for six hours each during an eight-hour work day. (R. at 124).

On August 9, 2012, Plaintiff underwent a posterior cervical decompression and fusion at C3-C6. (R. at 375). After performing Plaintiff's surgery, Dr. Lee gave the prognosis of "good pending medical stability." *Id*. By August 14, 2012, Plaintiff was able to ambulate more than 150 feet and denied any significant pain, although the records state that she seemed "euphoric" due to

the prescribed diazepam. (R. at 397). By August 15, 2012, she was able to independently transfer into the bath tub without grab bars and had kitchen mobility. (R. at 400). She was able to walk consistently over 150 feet, although she was still prescribed diazepam. (R. at 401). When discharged on August 16, 2012, Plaintiff was referred to outpatient physical therapy and prescribed six separate medications: (1) Colace, (2) Dulcolax, (3) Senokot, (4) Ultram, (5) Valium (Diazepam), and (6) Zofran. (R. at 470). An update on August 22, 2012, by Dr. Arnautovic provided that she was doing well and had no complaints. (R. at 495). Plaintiff received physical therapy for two months before being discharged, because she was told she "wasn't qualified for it anymore." (R. at 55).

On October 26, 2012, Plaintiff was seen at Mount Sinai Hospital, where the attending physician indicated that Plaintiff had right arm numbness for many years. (R. at 475). When meeting with Dr. Arnautovic on January 28, 2013, Plaintiff continued to complain of back pain. (R. at 499). Plaintiff indicated the pain was a 5/10 and was aggravated by position and twisting. *Id*. By May 9, 2013, she did not have any complaints or concerns. (R. at 503).

On December 5, 2012, the state agency physician, Dr. Vincent, completed a Disability Determination Explanation ("DDE"). (R. at 118-128). Dr. Vincent found that Plaintiff had a medically determinable impairment due to her surgeries, and that she could lift twenty pounds occasionally and ten pounds frequently. (R. at 123-24). She would be able to stand and walk for six hours in an eight-hour work day, as well as sit for six hours in an eight-hour work day. *Id*. Dr. Vincent's ultimate determination was that Plaintiff was not disabled. (R. at 127).

Both Dr. Arnautovic, her primary care physician, and Dr. Lee, her surgeon, provided their medical opinions on whether Plaintiff could perform work related activities. Dr. Arnautovic found Plaintiff could frequently lift and carry ten pounds. (R. at 523). She would be able to stand

and walk with normal breaks for less than two hours during an eight-hour day. *Id*. She would be unable to sit or stand for more than sixty minutes before having to change position. Additionally, she would be required to walk around for approximately five minutes every twenty to thirty minutes. (R. at 524).

Dr. Lee's assessment found that she could lift and carry less than ten pounds frequently, but could occasionally lift ten pounds. (R. at 531). He additionally found that she would be able to stand and walk with normal breaks for about three hours during an eight-hour day. *Id*. She would only be able to sit for forty-five minutes and stand for twenty minutes before being required to change positions. (R. at 532). She would need to walk around for five to ten minutes every thirty to forty-five minutes. *Id*. He additionally required Plaintiff to avoid concentrated exposure to chemicals. *Id*.

### III. ALJ Hearing

Plaintiff testified before the ALJ on November 1, 2013, in Chicago, Illinois. (R. at 28). She claims to have not worked since 2012, but had been previously employed as a housekeeper, security, home care, and hairdresser. (R. at 33-34). As security, Plaintiff was required to check individuals in at an apartment complex and steel mill. (R. at 35, 38). She was required to do rounds taking her approximately an hour, which she would have to complete every two hours. (R. at 35-36). As a caretaker for the sick and elderly, Plaintiff was required to cook, clean, dress, bathe, and run errands for her clients. (R. at 39). She claimed to stop working in 2012 due to her hands started to become numb and tingling. (R. at 40).

The numbness in her hands forced her to stop attending school to be a phlebotomist (R. at 15). Plaintiff claims that she additionally had to stop her work as a hairdresser in 2011 due to the pain in her hand. (R. at 45-46). The ALJ raised the issue of her tax returns, which showed she

5

earned $10,666 in 2011. (R. at 52). He questioned whether she had worked after her alleged onset date of April 1, 2011. (R. at 48)

Plaintiff admitted to attempting to walk every day, but that it did not happen on a regular basis. (R. at 56). Plaintiff testified it took her approximately an hour to walk to Commercial Avenue from her home, which she claimed was a mile away. Her attorney did not object to this statement, even though the distance Plaintiff testified to was later shown to be false. (R. at 56); (Pl's Br. 12). The distance truly covered only four-tenths of a mile. (Pl.'s Br. 12). Plaintiff additionally claimed to be unable to do many daily activities such as use knives, open jars, and carry groceries. (R. at 60-63).

The vocational expert was given a hypothetical based on the consultative exam, which included the ability to "lift and carry no more than 20 pounds occasionally and 10 pounds frequently, and can be on her feet standing/walking about six hours in an eight-hour work day with normal rest periods, and sit about six hours with normal rest periods." (R. at 81). The vocational expert found that an individual with those disabilities would still be able to work as a hairstylist or security clerk. (R. at 82). The ALJ then proceeds to use Plaintiff's treating physicians', Dr. Lee and Dr. Arnautovic, medical opinions as a hypothetical. (R. at 523-26; 531-34). Using their medical opinion, the vocational expert determined that they would not "satisfy the requirements for full-time competitive employment, which the Social Security Administration identifies as a 40 hour work week." (R. at 83).

### IV. The ALJ's Decision

In his decision, the ALJ found that: (1) Plaintiff met the insured status requirement of the SSA through September 30, 2016; (2) Plaintiff had engaged in substantial gainful activity since her alleged onset date of April 1, 2012; (3) Plaintiff had a severe impairment in the form of

6

cervical disc disease; (4) Plaintiff's impairment did not meet the severity listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526); (5) Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) subject to only occasional crouching, kneeling, and crawling, and the need to avoid operating moving or dangerous machinery, occasionally lifting and carrying 20 pounds, frequently lifting and carrying ten pounds, the ability to stand and walk six hours out of eight with normal rest periods, the ability to sit six out of eight hours with normal rest periods, and an exception to working at heights, climbing ladders, or frequently using stairs; (6) Plaintiff was capable of performing past relevant work as a security clerk (DOT # 372.667-038) and hairstylist (DOT # 739.684-086); and (7) Plaintiff had not been under disability, as defined in the SSA from April 1, 2012, through the date of the ALJ's decision. (R. at 11-17).

Additionally, the ALJ gave "little weight" to Plaintiff's treating physicians, Dr. Arnautovic and Dr. Lee, based on the perceived lack of documentation regarding Plaintiff's significant troubles walking, standing, and sitting. (R. at 16). The ALJ additionally discounted the treating physicians' medical opinions due to alleged contradictions between Plaintiff's testimony and the treating physicians' assessments. *Id*. The ALJ chose to give "great weight" to the state agency physician, Dr. Francis Vincent, because "[t]his appears a more reasonable conclusion given the evidence of record." (R. at 16).

## STANDARD OF REVIEW

The ALJ's decision must be upheld if it follows the administrative procedure for determining whether Plaintiff is disabled as set forth in the Act, if it is supported by substantial evidence, and if it is free of legal error. *See* 20 C.F.R §§ 404.1520(a), 416.920(a); 42 U.S.C. § 405(g). Substantial evidence is "relevant evidence that a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This standard is satisfied even if the ALJ makes only a "minimal[] articulat[ion of his] justification." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

## ANALYSIS

### I. The ALJ Did Not Follow the "Treating Physician" Rule

In giving "little weight" to the medical opinions of Dr. Lee and Dr. Arnautovic, the ALJ seems to have violated the "treating physician" rule. The "treating physician" rule requires the ALJ to give controlling weight to the medical opinion of Plaintiff's treating physician if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . ." 20 C.F.R. § 404.1527(d)(2); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). The ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence … [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985)). In order to provide this path when deciding to not give the treating physician controlling weight, the ALJ must evaluate six factors: (1) the nature of the examining relationship; (2) the length and extent of the treatment relationship; (3) the supportability of medical evidence; (4) the consistency of the opinion in relation to the record as a whole; (5) if applicable, the physician's specialization; and (6) other factors that may appease or contradict the opinion. 20 C.F.R. § 404.1527(c).

First and foremost, the ALJ failed to address the six factors necessary when giving controlling weight to a medical professional other than the treating physician. The only factor the ALJ considered in his decision was the inconsistency in the treating physicians' treatment notes

8

and those raised due to Plaintiff's testimony. (R. at 16); *see* 20 C.F.R. § 404.1527(c)(4). The ALJ did not engage in any discussion regarding any of the additional five factors, even though many of these factors favor giving Dr. Lee and Dr. Arnautovic's medical opinions controlling weight: Dr. Lee is a spinal cord injury specialist, Dr. Arnautovic is Plaintiff's primary care physician, and plaintiff met with Dr. Arnautovic on a monthly or bi-monthly basis for an extended period. (Pl.'s B. 4); (R. at 14); *see also Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (holding an ALJ's decision unsatisfactory because they did not address considerations favoring the treating physician, such as treatment relationship, specialty, and consistency of appointments). There is no evidence that the ALJ took any of these factors into consideration in making his determination. The Court, thus, cannot "trace the path of the ALJ's reasoning." *Carlson* 99 F.2d at 181. As such, the Court must remand the case for further proceedings.

## II. The ALJ Only Considered Evidence that Supported his Opinion and Ignored the Medical Evidence Supporting Plaintiff's Disability Claim

Even if this Court held the ALJ had provided enough reasoning in evaluating the six factors, the ALJ's reasoning engages in the cherry-picking that the Seventh Circuit has deemed erroneous. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (showing an ALJ must consider all evidence, not just evidence supporting his finding); *see Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (showing an ALJ may not selectively consider reports, but must consider "all relevant evidence"). While the ALJ may not cherry-pick findings, they need not include every piece of evidence in their opinion. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) (citing *Carlson v. Shalala*, 999 F.2d at 181) (finding "an ALJ need not provide a complete written evaluation of every piece of testimony and evidence").

The ALJ engaged in a pattern of selectively citing facts beneficial to his final determination throughout the written opinion, but consistently overlooked facts that were in

9

conflict with the opinion. The ALJ ignored conflicting evidence detrimental to his findings when evaluating Plaintiff's second major surgery, a C3-C6 laminectomy and fusion. The only consultative examination of Plaintiff occurred on July 13, 2012, almost a month prior to Plaintiff's second surgery. (R. at 96-104). The DDE performed by Dr. Francis Vincent after the second surgery continues to rely on the consultative exam that occurred in July, prior to her surgery, even though Dr. Francis clearly states that there was insufficient evidence in the record and a current physical exam is needed. (R. at 122). The ALJ gave this DDE controlling weight, while simultaneously giving Plaintiff's treating physicians "little weight." (R. at 16). Dr. Vincent never met or examined Plaintiff and used dated information, whereas Plaintiff met with Dr. Lee and Dr. Arnautovic on multiple occasions before and after the surgery. *Id.* The ALJ did not consider this issue, despite deciding to give controlling weight to the DDE.

     This Court finds an additional issue in the selective use of information from the treating physicians' treatment notes. In the days following Plaintiff's second surgery, treatment notes showed she was able to walk more than 150 feet and denied any significant pain. (R. at 397). While the ability to walk 150 feet during rehabilitation may show significant progress, the ALJ fails to take into account a number of drugs she had been taking. (R. at 397). The ALJ pulled facts from treatment notes discussing Plaintiff's ability to walk 150 feet and her denial of pain, but ignored comments such as "[p]atient appears a bit euphoric. We will begin to wean her diazepam today. . ." (R. at 397). Her ability to walk 150 feet indicates progress, but at no point does this alone show that any definitive contradiction to the medical assessments of Plaintiff's treating physicians. In other words, the ALJ was selectively ignoring evidence that conflicted with his opinion, thereby requiring remand.

## CONCLUSION

For the preceding reasons, this Court remands this matter for further proceedings consistent with this opinion. The Court grants Plaintiff's motion for summary judgment [16] and denies the Commissioner's motion for summary judgment [23].

**ENTER:**

**DATED:** 7/13/2016

_____

Susan E. Cox
United States Magistrate Judge